UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES BROWN,

    Plaintiff,

v.                                         Case No. 21-cv-625

KRISTIAN LEHMAN, *et al.*,

    Defendants.

**ORDER**

    Plaintiff Charles Brown, who is representing himself and currently confined at Fox Lake Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 1.) Brown was allowed to proceed on an Eighth Amendment claim against all defendants because they were allegedly deliberately indifferent to Brown's exposure to COVID-19 (COVID). Brown was also allowed to proceed on a First Amendment retaliation claim against defendants Kristen Lehman and Joley Sroka for allegedly retaliating against him for filing inmate complaints about his exposure to COVID. Additionally, the court took supplemental jurisdiction over Brown's state law professional negligence claims and medical malpractice claims against the defendants who worked in the Health Services Unit. The defendants filed motions for summary judgment. (ECF Nos. 83, 84, 93.) The motions are fully briefed and ready

for a decision. For the reasons stated below, the court grants the defendants' motions for summary judgment.

## FACTS

*Parties*

At all times relevant, Brown was incarcerated at Redgranite Correctional Institution (RGCI). (ECF No. 95, ¶ 1.) The following defendants are the "State Defendants": Kristian Lehman, Joely Sroka, Justin Feltz, Hannah Rudolph, Jacaup Podoll, Quade Jones, Syann Brown, Kira Labby, Christine Burnett, Angela Thompson, William Borgen, Cindy Barter, Austin Korman, Lan Heinsohn, Lyla Hansen, Katie Sennhenn, and Cathy Brasch. (ECF No. 94 at 1.) Lehman, Sroka, Feltz, Rudolph, Podoll, Jones, and Brown are security officers ("State Security Defendants"). (*Id.*) The remainder of the State Defendants are employed in the Health Services Unit (HSU) in various capacities ("State HSU Defendants:"). (*Id.* 1-2.)

Defendants Janell Torres, Sarah Miller, Sara Goodhue, Amanda Delrow, Alyssa Van Winkle, Shari Whalers, and Lynnae Sievert were all employed by an outside contractor and assigned to RGCI's HSU. (ECF No. 86, ¶¶ 14-20.) Along with defendant Christina Hildebrand, who was an HSU administrative assistant, these defendants make up the "Contracted HSU Defendants". (ECF No. 88, ¶ 2.)

*RGCI's COVID Policies and Procedures*

Starting at the beginning of the COVID pandemic, RGCI implemented several policies and procedures to mitigate the spread of COVID. (ECF No. 95, ¶ 14.) These

2

included such practices as wearing a mask; maintaining personal hygiene; keeping one's cell clean; social distancing when able; and reporting health concerns to HSU staff as soon as possible. (*Id.*) When a prisoner tested positive for COVID, he would be placed in isolation. (*Id.*, ¶ 26.) The H-North housing unit was the COVID unit. (*Id.*) An HSU staff member would call the unit manager of the H-North unit to find out if there was any space available in the H-North unit. (*Id.*) If there was space, the prisoner would be transferred to the H-North unit. (*Id.*) If there was not space, the prisoner was ordered to isolate in place in his cell on his current unit. (*Id.*, ¶ 27.) Many cells did not have bathrooms, so even though the prisoner had to isolate, he was allowed to leave his cell to use the bathroom, but he was required to be masked at all times. (*Id.*) If a bed opened up in the H-North unit, the prisoner would then be transferred to that unit. (*Id*, ¶ 28.)

*Brown's Exposure to COVID*

Brown states that he has several medical conditions such as asthma and diabetes, which put him at higher risk of developing a serious and potentially deadly case of COVID. (ECF No. 109 at 2.) According to Brown, on October 21, 2020, "HSU staff" allowed two prisoners to return to Brown's housing unit even though they had tested positive for COVID. (ECF No. 112, ¶ 22.) As result, 244 prisoners, including Brown, tested positive for COVID a week later. (*Id.*) Brown does not provide any additional information demonstrating that these two individuals were responsible for infecting both him and the other 243 prisoners. At most, he states that before interacting with those two prisoners, who were allowed to move unmasked through

3

the common areas by unidentified security staff, he felt fine. (ECF No. 109 at 6.) It is unclear from Brown's materials if any of the security staff who allowed the infected prisoners to move about the housing unit unmasked were State Security Defendants. The only State Security Defendant mentioned by name is Fultz, who told the prisoners to return to their cells because they needed to isolate. (*Id.* at 8.)

On October 27, 2020, Brown was tested for COVID by the Wisconsin National Guard as part of an institution-wide test. (ECF No. 109 at 3.) Also on October 27, 2020, Brown had "been having what he thought was cold symptoms for a few days, the chills, cough, running nose with no small, body aches. (*Id.*) He learned he tested positive for COVID on October 31, 2020. (*Id.*) On November 1, 2020, unidentified HSU nursing staff examined him, where Brown reported cold-like symptoms and that the symptoms were better than they were on October 27. (ECF No. 112, ¶ 40.) Brown was given cold medicine, Alka Seltzer, and cough drops. (*Id.*) On November 5, 2020, Brown filed a Health Service Request (HSR) complaining that his inability to go outside and get fresh air was irritating his asthma and sinuses. (*Id.*, ¶ 41.) Brown was seen again on November 10, 2022, and did not report any new symptoms in addition to the initial cold symptoms he experienced on October 27. (*Id.*, ¶ 42.)

Brown states that RGCI staff, though he does not mention any of them by name, failed to take reasonable steps to prevent the spread of COVID. (ECF No. 109 at 9.) The only facts he presents to support this assertion is his October 21 exposure.

*Allegations Related to Brown's Retaliation Claim*

4

Brown asserts that defendants Lehman and Sroka fabricated a conduct report for possession of a contraband substance in retaliation for engaging in protected speech. (ECF No. 95, ¶ 68.) On December 13, 2020, Sroka was ordered by her superiors to be part of a team to search Brown's cell. (*Id.*, ¶ 72.) During the search, she found "a bottle of red colored liquid" with Brown's name and prisoner number on it. (*Id.*) Defendant Lehman was informed about the bottle and had it tested (*Id.* ¶¶ 76-78.) The bottle tested positive for alcohol. (*Id.*, ¶ 79.) As a result, Brown was placed on Temporary Lockup Status and was issued conduct report # 139190. (*Id.*, ¶ 80.)

Both Lehman and Sroka maintain that they were unaware of any inmate complaints that Brown may have filed because inmate complaints are confidential, and they do not play a part in the grievance process. (ECF No. 95, ¶¶ 83-85.) Brown states that on several occasions both Lehman and Sroka asked him about his inmate complaints. (ECF No. 110, ¶¶ 69. 71. 75.) Brown asserts that because the conduct report was issued around the same time he filed his inmate grievances, it is evidence that the conduct report was issued in retaliation. (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if

5

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Brown claims that all the defendants violated his Eighth Amendment rights when they failed to prevent the spread of COVID. He also claims that Lehman and Sroka violated his First Amendment rights when they issued a conduct report in retaliation for filing inmate complaints.

*Brown's Eighth Amendment Claim*

6

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). In order to demonstrate a violation of the Eighth Amendment, a prisoner must make two showings. "First, the deprivation alleged must be, objectively, sufficiently serious. *Id*. at 824 (quotations omitted). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. The second requirement is that the prison official was deliberately indifferent "to inmate health or safety," meaning that he was both aware of and disregarded "an excessive risk to inmate health or safety." *Id*. at 837.

For the purposes of summary judgment, the defendants do not dispute that exposure to COVID is an objectively serious condition (or at least it was at the time). Thus, the issue becomes whether the defendants were deliberately indifferent to this excessive risk to prisoner health and safety. "'Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm was not ultimately averted.'" *Wilson v. Williams*, 961 F.3d 829, 840 (7th Cir. 2020) (quoting *Farmer*, 511 U.S. at 844). The Seventh Circuit Court of Appeals has determined that for COVID cases, whether prison officials reasonably responded to the risk is the "key inquiry". *Id*. To determine whether prison officials responded reasonably, the district court "must

7

consider the totality of the circumstances surrounding the challenged action." *Mays v. Dart*, 947 F.3d 810, 820 (7th Cir. 2020). The court should keep in mind that it should give "substantial discretion" to prison officials "'to devise reasonably solutions to the problem the face' particularly when safety and security interests are at stake." *Id.* (quoting *Florence v. Bd. Of Chosen Freeholders of Cty. Of Burlington*, 556 U.S. 318, 326 (2012)). This includes giving "'deference to policies and practices needed to maintain order and institutional security.'" *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 399-400 (2015)).

It appears that Brown has named all the prison officials who were working in the HSU and on his housing unit on October 21, 2020—the date he asserts he contracted COVID. It is undisputed that Sara Goodhue actually did not work on that date. Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Summary judgment is therefore granted in her favor, and she is dismissed.

Brown argues that because two prisoners who were infected with COVID were allowed to return to his housing unit, all of the remaining defendants were deliberately indifferent to an excessive risk to his health and safety. However, Brown does not establish that any of HSU defendants were aware that the two prisoners had COVID. As for the State Security Defendants, he establishes only that Fultz was

8

aware the two prisoners had COVID. He fails to show that the remaining State Security Defendants were aware the prisoners were infected. Furthermore, he does not demonstrate that Fultz was deliberately indifferent to the risk. In fact, Brown demonstrates that Fultz attempted to mitigate the risk by ordering the two infected prisoners to return to isolation.

Even if Brown had established that the defendants were aware that the prisoners were infected on October 21, and sent them back to the housing unit while positive for COVID, he does not demonstrate that their response was unreasonable. It is undisputed that RGCI's current COVID policy at the time was to have prisoners isolate on their housing units if there were no beds available in the quarantine unit. This may not have been the ideal way to manage a COVID outbreak, but considering the prison setting, the competing security interests, and the many other practices RGCI had in place (such as masking, heightened cleaning protocols, and social distancing), such a policy is far from unreasonable. Brown argues that RGCI's policies and practices were inadequate because they failed to prevent the spread of COVID, but prison officials "will likely not be found to be deliberately indifferent if they took some action, even if that action was inadequate." *Wilson*, 961 F.3d at 843. An inadequate response is not evidence that prison officials "disregarded a known risk or failed to take any steps to address the risk . . . such that [their] response falls below the constitutional minimum set by the Eighth Amendment." *Id.*

As for the State Security Defendants, Brown argues that they failed to implement the isolation policy because the two infected inmates were allowed to move

9

about the housing unit unmasked. A violation of institutional policy on its own, though, does not amount to a constitutional violation. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017). Brown also does not include specific details of how each State Security Defendant otherwise failed to mitigate the risk of exposure, and as mentioned above, actually provides evidence that at least one defendant was mitigating the risk. Thus, he fails to prove that they were deliberately indifferent. "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). "It is therefore incumbent on the party opposing a summary judgment motion to 'inform the district court of the reasons why summary judgment should not be entered'" *Reed v. Brex, Inc.*, 8 F. 4th. 569, 578 (7th Cir. 2021) (quoting *Riely v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018)).

Brown also does not prove that his October 21 exposure to the two infected inmates is the reason he tested positive for COVID on October 27. To prevail on a § 1983 claim, a plaintiff must show that there was "an actionable injury caused by the defendant's wrongful act." *Fields v. Wharrie*, 740 F.3d 1107, 1111 (7th Cir. 2014). Brown simply speculates that he contracted COVID when he was exposed on October 21, and his only "proof" is that he felt fine before the two prisoners were allowed back on the housing unit. This is insufficient to demonstrate causation. "A party must present more than mere speculation or conjecture to defeat a summary judgment motion." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 936 (7th Cir. 2021). When

10

RGCI's entire prison population was tested on October 27, it turned out that 244 prisoners had COVID. Given COVID's two-week incubation period, and the large number of prisoners who were likely infected, it is virtually impossible to determine how he contracted COVID.

Additionally, it is undisputed that Brown suffered only minor COVID symptoms and avoided any serious complications. It is unlikely, though the Seventh Circuit has yet to confirm, that suffering mild-to-moderate COVID symptoms, which a majority of the American population have experienced since 2020, rises to a level of injury that warrants constitutional liability.

As demonstrated above, for a variety of reasons, no reasonable factfinder could conclude that the defendants failed to respond reasonably to the risk of contracting COVID. Summary judgment on Brown's Eighth Amendment claim is granted in favor of the defendants, and the claim is dismissed.

*Brown's Retaliation Claim*

To demonstrate a retaliation claim, a plaintiff must allege that "(1) [the plaintiff] engaged in an activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). If the plaintiff makes this prima facie showing, the defendants must show that the adverse action would have occurred anyway. *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013). In other words, if the plaintiff meets all three initial elements of a retaliation claim, the burden of proof

11

shifts to the defendants to show that they would have taken the same actions "even in the absence of protected conduct." *Green v. Dourff*, 660 F.3d 975, 979 (7th Cir. 2011). If the defendants can make this showing, then the plaintiff must demonstrate that their proffered reason was pretextual (*i.e.,* a lie) and that the real reason was retaliatory animus. *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012).

The defendants stipulate that Brown meets the first two elements. It is also undisputed that the defendants, in discovering alcohol in Brown's cell, would have issued the conduct report regardless. There is a question of fact as to whether Brown's First Amendment activity was a motivating factor. The defendants state they had no idea that Brown filed inmate complaints. Brown states he discussed his inmate complaints with the defendants on several occasions. However, this question of fact is immaterial because no reasonable factfinder could conclude that the defendants' reason for issuing the conduct report was pretextual. Brown merely speculates based on timing that the defendants conspired to issue the conduct report as retaliation for filing inmate complaints. But there can be no dispute that possession of alcohol would have generated the same conduct report even in the absence of any protected conduct. As discussed above, Brown's speculation is insufficient to overcome summary judgment. Summary judgment is granted in Lehman's and Sroka's favor on the First Amendment retaliation claim, and the claim is dismissed.

*Brown's State Law Claims*

At screening, the court exercised supplemental jurisdiction over Brown's negligence and medical malpractice claims under Wisconsin state law. Now that the

court has granted summary judgment in favor of defendants and dismissed the federal claims, the court declines to continue to exercise that jurisdiction. *See* 28 U.S.C. §1367(c); *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015).

## CONCLUSION

For the foregoing reasons, the court grants the defendants' motions for summary judgment. The State Defendants also argued that they were entitled to qualified immunity. Because the court grants summary judgment in their favor on the merits, the court does not need to address the qualified immunity argument. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motions for summary judgment (ECF Nos. 83, 84, 93.) are **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment

under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 10th day of April, 2024.

STEPHEN DRIES
United States Magistrate Judge